# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30237

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2017

Lyle W. Cayce
Clerk

FRANCIS EUGENE REED, JR.,

 Petitioner–Appellant,

v.

DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY,

 Respondent–Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CV-543

Before STEWART, Chief Judge, and WIENER and PRADO, Circuit Judges.

PER CURIAM:*

 Petitioner–Appellant Francis Eugene Reed, Jr. filed this habeas petition seeking collateral review of his Louisiana aggravated rape conviction. The district court denied habeas relief but granted a certificate of appealability ("COA") on one issue: whether trial counsel was ineffective for failing to impeach the victims' testimony with prior inconsistent statements. For the reasons stated below, we AFFIRM.

---

 * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-30237

## I. BACKGROUND

**A.    The Trial**

Reed was charged with and convicted of aggravated rape of his two minor stepdaughters, KP-1 and KP-2.[1] According to the victims, their stepfather began abusing them in 2000. The victims both testified that Reed forced them to perform oral sex on him and engage in vaginal intercourse with him. Each of the victims testified that this abuse occurred about three times per week for four or five years.

According to KP-2's friend Stephi King, one day in May 2005, she and KP-2 went to the victims' house and found that the front door was locked. KP-1 came to the door in a long shirt. It was clear she had been crying. Stephi also saw Reed zipping up his fly and noticed a foul odor in the house. After KP-2 and Stephi stepped inside, KP-1 dropped something; when she picked it up, Stephi noticed that KP-1 was not wearing any underwear.

Based on this incident, Stephi suspected sexual abuse. On the advice of Stephi's stepfather, Robert Jeanfreau, Stephi and her friend Stephanie Caballero wrote a letter to KP-2 asking her whether KP-1 was being abused. Stephanie testified that KP-2 initially denied the abuse, but shortly thereafter wrote the following letter:

> Dear Steph, remember the question you asked me about [KP-1] and I, and I said no? No isn't true. Yes. Yes would be the truthful answer, but [KP-1] likes it. She never cries about it. He does it to me, too. He makes us do other things, too. He makes us drink alcohol, too. I hate it. That's not the reason she cries when he yelled at her. I don't know that reason. Tell [another friend]. Just tell him what happens to me, and go home when my mom is not home. You can tell anyone who won't tell anyone else.

---

[1] KP-1, the older sister, was born in 1991. KP-2 was born in 1993.

Stephi gave this letter to Jeanfreau, who testified that he immediately notified the authorities. Luanne Mayfield from the Office of Community Services testified that she interviewed KP-2 at school shortly thereafter and that KP-2 confirmed the allegations of sexual abuse. That day, Mayfield also interviewed KP-1, who was home schooled. Although KP-1 was initially hesitant to talk, she eventually described the abuse in similar terms as KP-2.

Rachel Smith of the St. Tammany Parish Sheriff's Office testified that in May 2005, the victims recanted their story. Additionally, physical examinations did not reveal signs of abuse, although Dr. Adriana Jamis testified at trial that no physical signs were expected given the lapse of time between the abuse and the examinations. The authorities did find Reed's semen on the carpet in KP-1's and KP-2's bedrooms. Later, in April 2006, the victims gave taped interviews at the Children's Advocacy Center ("CAC") during which they again confirmed the sexual abuse. The investigation culminated in Reed's indictment on April 25, 2007. Reed pleaded not guilty, and the case went to trial.

Both KP-1 and KP-2 testified at trial. On cross-examination, Reed's counsel did not impeach the victims based on inconsistent statements in the CAC tapes. But defense counsel did bring out the fact that both victims initially denied the abuse to several individuals.[2] At the conclusion of each victim's testimony, defense counsel stipulated that the trial testimony was consistent with the taped CAC interview. The tapes were entered into evidence but not played for the jury. Reed, testifying in his defense, denied his stepdaughters' allegations of sexual abuse.

---

[2] In response, both Bethany Case, who conducted the CAC interviews, and Dr. Jamis testified that children sometimes recant out of the fear that telling the truth will result in negative consequences. KP-2 testified that she recanted because she was afraid Reed might hurt her if she told the truth, and KP-1 explained that she too was afraid of what might happen if she told the truth.

No. 15-30237

The jury convicted Reed of two counts of aggravated rape, for which he received two sentences of life imprisonment. The Louisiana appellate court affirmed the convictions and amended the sentences to life imprisonment at hard labor. *State v. Reed*, No. 2010-0571, 2010 WL 4272897 (La. Ct. App. Oct. 29, 2010). Reed did not seek review by the Louisiana Supreme Court.

## B.    Habeas Petitions

Reed filed his state application for post-conviction relief in November 2011. This application claimed ineffective assistance of counsel for, among other things, failing to impeach KP-1 and KP-2 with prior inconsistent statements made during the CAC interviews. The most significant of these inconsistencies concerns the day in May 2005 when Stephi first suspected sexual abuse. At trial, KP-1 testified:

> I was being abused, and I heard a knock on the door, and it was [KP-2]. . . . [Reed] said, don't worry about it. I said, it's [KP-2], let me go get the door. He said okay, and I opened the door, and it was [KP-2], and I know it was Stephi.

During the CAC interview, however, KP-1 stated that "nothing had happened" on that day. KP-1 explained that

> whenever I told them about that day, I was veering around the truth because whenever [Stephi] came that day, nothing had happened to me. The reason why I was crying is because I got sent to my room. And I had a long shirt on and I had shorts underneath it. She just thought I had a shirt on. But nothing had happened.
>
> But I just remember her coming to the door, and I was all hot-faced and red . . . .
>
> INTERVIEWER: You said something about veering around the truth or something?
>
> KP1: Uh-huh. What I mean was I knew what had happened, and, you know, I was just kind of, you know, saying, "This—no, this didn't happen. This is what really happened." You know, I was telling the truth, but on part of it, I wasn't.
>
> INTERVIEWER: What do you mean?

4

> KP1: Like I was—whenever I was telling them that nothing happened that day that when [Stephi] came to the door, I was seriously just upset because I went to my room, you know. I was saying nothing happened.
>
> INTERVIEWER: That day?
>
> KP1: Nothing happened that day, you know. I was—I wasn't actually saying nothing happened at all.

The Louisiana trial court dismissed Reed's application in March 2012. In addressing counsel's failure to impeach the victims' testimony with statements made during their CAC interviews, the court noted that:

> Trial counsel often choose not to have the victim's interview shown to the jury, as more often than not any discrepancies between the child's interview and the in court testimony are insignificant as weighed against the jury having to hear the child discuss the events of offense that occurred years prior.

The court disagreed with Reed's "characterization of the CAC tapes as materially inconsistent with the victims' trial testimony," and "determine[d] it was not ineffective assistance of counsel to stipulate to the CAC tapes in order to avoid having them played for the jury." The Louisiana Court of Appeal and Supreme Court denied review.

Reed filed his federal habeas petition in March 2013, alleging ineffective assistance of both trial and appellate counsel. The magistrate judge recommended dismissing the petition in its entirety. The magistrate judge addressed each of the discrepancies between the victims' CAC interviews and trial testimony in turn:

1. At trial K.P.1 testified that she had never witnessed petitioner engage in sexual acts with K.P.2; however, in the CAC interview, K.P.1 stated that she witnessed petitioner licking K.P.2's vagina. While this discrepancy is obviously consequential, its revelation could easily have been more harmful than beneficial to the defense.

2. At trial K.P.1 testified that she traveled to Biloxi in a separate car from petitioner after the allegations became public;

however, in the CAC interview she stated that they traveled together. This discrepancy seems largely inconsequential, and it does not appear the revelation would have significantly benefitted the defense.

3. At trial, K.P.2 testified that petitioner had made her swear on a Bible not to disclose the abuse; however, she made no such statement in the CAC interview. This discrepancy likewise seems largely inconsequential, and it does not appear the revelation would have significantly benefitted the defense.

4. At trial, K.P.2 testified she was walking out of her room prior to the first incident of abuse; however, in the CAC interview she stated that she was in her room watching television or reading a book. This discrepancy also seems largely inconsequential, and it does not appear the revelation would have significantly benefitted the defense.

5. At trial, K.P.2 did not testify concerning abuse by anyone other than petitioner; however, in the CAC interview she stated that she had been assaulted by her stepbrother. This was not an actual discrepancy, in that she was not questioned at trial about abuse by others.

6. At trial, K.P.1 testified that her friend Stephi King interrupted petitioner's sexual assault on a specific occasion; however, in the CAC interview K.P.1 stated that nothing had actually happened to her on *that day*. This discrepancy is arguably consequential and seemingly would have been beneficial to the defense.

The magistrate judge reasoned that the benefit of raising this last "seemingly significant discrepancy" would be outweighed by "the downside of playing the CAC interviews for the jury." Playing these tapes would have required the jury "to sit through yet another recitation of the traumatic abuse . . . , only this time as recounted by the purported victims at even younger and more innocent ages which, presumably, might have made the abuse seem all the more harrowing." Accordingly, the magistrate judge recommended not second-guessing trial counsel's tactical decision to forego impeaching the victims with this "double-edged" evidence.

No. 15-30237

The district court adopted the magistrate judge's recommendation and dismissed Reed's petition with prejudice. On motion, however, the district court granted a COA on Reed's "Sixth Amendment Right to Effective Assistance of Counsel related to failure to impeach a witness at trial." Reed timely appealed.

## II. DISCUSSION

On appeal, Reed argues that trial counsel's failure to impeach KP-1 and KP-2 with the CAC interviews constituted ineffective assistance of counsel. Reed focuses on the incident in May 2005 when KP-2 and Stephi allegedly interrupted his abuse of KP-1. Reed does not meaningfully contest the magistrate judge's findings that the other discrepancies were either insignificant, harmful to the defense, or not actually inconsistent with trial testimony. Accordingly, we confine our review to the discrepancy involving the May 2005 incident.

### A.    Standard of Review

In a habeas case, this Court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002). A federal court may not grant relief to a habeas petitioner on a claim adjudicated on the merits by a state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Under § 2254(d)(1), a decision is contrary to clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and comes to the opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A decision

7

unreasonably applies clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts" or "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

Review of a claim of ineffective assistance of counsel under § 2254(d) is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

**B.     Analysis**

To establish ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner must show both that "counsel's performance was deficient" and that this "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We address each prong in turn.

On the first prong of the *Strickland* test, courts apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Counsel's "conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) (quoting *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009)).

The district court held that trial counsel's failure to impeach the victims with their CAC interviews was strategic. "[T]he trial strategy," according to the district court, was likely "to prevent those CAC interviews from being shown because of their potential harm to petitioner's defense at trial." This Court has held in the mitigation context that "a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997). In *Pape*, this Court applied a similar "double-edged evidence" rule in the impeachment context. 645 F.3d at 290. There, impeaching the credibility of the defendant's wife would have allowed the state to introduce evidence of the defendant's other crimes (namely, possession of child pornography). *Id.* Because impeachment could have been more harmful than helpful to the defendant, this Court held that the state habeas court did not unreasonably apply *Strickland* in finding that counsel's choice not to impeach the wife's credibility was reasonable. *Id.*

Here, as in *Pape*, impeachment could have led to an adverse outcome—the state playing the CAC tapes for the jury. As the magistrate judge found, doing so would have forced the jury "to sit through yet another recitation of the traumatic abuse . . . , only this time as recounted by the purported victims at even younger and more innocent ages which, presumably, might have made the abuse seem all the more harrowing." Moreover, the CAC interviews did not contain any exculpatory evidence. *Cf. Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (finding counsel's failure to impeach was deficient because the impeachment evidence "had significant exculpatory value"). Even regarding the one significant discrepancy between the interview and the trial, KP-1 made it clear in her interview that she "wasn't actually saying nothing happened at all"; she meant that no abuse occurred on one specific day. Thus, it is at least reasonably arguable that counsel's stipulation to the CAC interviews'

consistency with trial testimony and his concomitant failure to impeach the victims with these interviews were reasonable tactical decisions. *See Richter*, 562 U.S. at 105. The district court did not err in denying habeas relief on this ground.

On the second prong of the *Strickland* test, which neither the state habeas court nor the district court addressed, "a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

Reed has not demonstrated a reasonable probability that impeaching the victims with their CAC interviews would have changed the outcome. First, the CAC tapes themselves largely corroborated the victims' trial testimony. Second, as discussed above, playing the CAC tapes could have been harmful to the defense. This Court has held that similarly double-edged evidence cannot support a showing of prejudice under *Strickland*. *See Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000). Third, the victims likely would have appeared credible even if trial counsel had emphasized the discrepancies between their CAC interviews and trial testimony. The victims described their abuse to the jury in painful and convincing detail. Their descriptions were consistent with KP-2's letter as well as Mayfield's and Officer Smith's accounts of what the victims stated in May 2005. And the only impeachment evidence introduced by defense counsel consisted of easily explainable denials and recantations. In light of these facts, the discrepancies in the CAC interviews would not have

No. 15-30237

sown sufficient doubt about the victims' credibility in the minds of the jurors.[3] Thus, trial counsel's failure to impeach was not prejudicial.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[3] Moreover, some physical evidence supported the victims' accounts: Reed's semen was found on the carpet in KP-1's and KP-2's bedrooms.