# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 12, 2012

Lyle W. Cayce
Clerk

No. 11-70012

ARTHUR BROWN, JR.,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, GARZA, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Arthur Brown, Jr. was convicted and sentenced to death in Texas for the
1992 murders of Jessica Quinones, Jose Guadalupe Tovar, Frank Farias, and
Audrey Brown.  He has applied for a certificate of appealability ("COA") from
this Court so that he can appeal the district court's denial of federal habeas relief
on his claim that his trial counsel rendered ineffective assistance by failing to
adequately investigate and present mitigating evidence at the punishment phase
of his trial.  After reviewing the record and the briefs, we conclude that
reasonable jurists would not find debatable the district court's conclusion that
the state court did not unreasonably apply clearly established federal law on the

No. 11-70012

record before it, and that Brown's claims are not adequate to deserve encouragement to proceed further. We therefore DENY Brown's request for a COA.

## I.

Rachel Tovar and her husband, Jose, were drug dealers in Houston, Texas. They supplied marijuana and cocaine to other drug dealers, including Brown and his associates, who were from Tuscaloosa, Alabama. On June 19, 1992, Brown traveled from Tuscaloosa to Houston, accompanied by Marion Dudley, Antonio Dunson, and Maliek Travis. They arrived at the Houston residence of Brown's sister, Grace, early in the morning on June 20.

That evening, six people were bound and shot in the head at Rachel Tovar's residence in Houston. Four of them died: Jessica Quinones, the pregnant common-law wife of Rachel Tovar's son, Anthony; Jose Guadalupe Tovar, Rachel Tovar's husband; Audrey Brown, one of Rachel Tovar's neighbors; and Frank Farias, Rachel Tovar's son. Rachel Tovar and Alexander Camarillo, also known as Nicolas Cortez Anzures, survived and testified at Brown's trial. Both of them identified Brown and Dudley, whom Tovar knew, from previous drug deals, by the nicknames of "Squirt" and "Red," as the shooters.[1] Three of Brown's sisters – Serisa Ann Brown, Grace Brown, and Carolyn Momoh – testified as witnesses for the State at the guilt-innocence phase. All three of them claimed that the police and prosecutors had threatened them in order to coerce their cooperation. Carolyn Momoh was held in contempt and incarcerated at one point during the trial for invoking the Fifth Amendment, despite the fact that she had been given immunity. After she eventually testified, she was convicted of perjury. The jury convicted Brown of capital murder.

---

[1] Dudley was convicted of capital murder and sentenced to death. He was executed in January 2006. Dunson was convicted of capital murder and sentenced to life imprisonment.

No. 11-70012

At the punishment phase of Brown's trial, the State re-offered all of the evidence presented at the guilt-innocence phase. The State also presented evidence that Brown had committed an armed robbery in Tuscaloosa four years earlier; that he had extorted other prisoners while in the Harris County Jail awaiting trial; and that he had assaulted a deputy at the Harris County Jail. The defense presented Brown's school records, which reflected that he had a low IQ, suffered from learning disabilities, and performed poorly in special education classes.[2] The defense also presented the testimony of a law professor that convicted, incarcerated offenders become less violent as they age. The jury answered affirmatively the special punishment issues on future danger and whether Brown actually caused the deaths, intended to kill the victims, or anticipated that human life would be taken. It answered negatively the special punishment issue on mitigating circumstances. The trial court sentenced Brown to death.

The Texas Court of Criminal Appeals affirmed Brown's conviction and sentence on direct appeal. *Brown v. State*, No. 71,817 (Tex. Crim. App. Dec. 18, 1996) (unpublished). The Supreme Court denied certiorari. *Brown v. Texas*, 522 U.S. 940 (1997).[3]

In his state habeas application, filed in March 1998, Brown claimed that his counsel rendered ineffective assistance at the punishment phase and that the state habeas court deprived him of due process and an impartial tribunal because the court denied adequate funding to develop his claims and refused to provide full and fair consideration of the claims.

---

[2] During deliberations at the punishment phase, the jury sent out a note asking to see Brown's school records.

[3] Four Justices dissented from the denial of certiorari on Brown's claim regarding parole eligibility.

3

No. 11-70012

On May 11, 2006, the trial court ordered the parties to submit proposed findings of fact and conclusions of law.  Brown filed written objections to the state court's inadequate fact-finding procedures and requested a hearing.  The court conducted a telephonic hearing, but deferred ruling.  On August 31, 2007, the state habeas trial court signed the State's proposed findings of fact and conclusions of law, and recommended that post-conviction relief be denied.  The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions, except those relating to his claims that his state habeas counsel was rendered ineffective as a result of the denial of additional investigative funds, but nevertheless denied relief on all of his claims.  *Ex parte Brown*, 2008 WL 2487788 (Tex. Crim. App. June 18, 2008) (unpublished).

Brown filed a petition for federal habeas relief in January 2009.  On February 28, 2011, the district court, in a thorough and well-reasoned opinion, denied Brown's petition for federal habeas relief and denied his application for a COA.  *Brown v. Thaler*, No. H-09-74 (S.D. Tex. Feb. 28, 2011) (unpublished).  Brown filed a motion for a new trial, which the district court denied on May 9, 2011.

II.

Brown seeks from this Court a COA to appeal the denial of habeas relief on his ineffective assistance claim.  To obtain a COA, Brown must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), "or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citation omitted).  "[A] claim can be debatable even though every jurist of reason might agree, after the COA has

been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. In making the decision whether to grant a COA, this court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. The court cannot deny a COA because it believes the petitioner ultimately will not prevail on the merits of his claims. *Id.* at 337. On the other hand, "issuance of a COA must not be *pro forma* or a matter of course." *Id.* "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (brackets, internal quotation marks, and citations omitted).

Before turning to Brown's ineffective assistance claim, we first address his contention that the district court should have considered alleged deficiencies in the state habeas proceedings in determining whether the state court's decision was reasonable.

### A.

In the state habeas proceedings, Brown requested and received $2,500 for the services of an investigator, at a rate of $50 per hour. Brown's state habeas counsel retained Lisa Milstein, a private investigator and mitigation specialist. In addition to interviewing witnesses and examining evidence in Houston, Milstein traveled to Tuscaloosa, Alabama, and interviewed Brown's family and friends. She obtained an affidavit from Brown's mother in which the mother described her consumption of alcohol during her pregnancy with Brown. Milstein did not obtain affidavits from anyone else. Milstein ran out of money and returned to Houston without completing her investigation.

Brown sought additional funds from the Texas Court of Criminal Appeals. Milstein estimated that it would have cost an additional $2,700 to complete her

investigation. The Court of Criminal Appeals authorized reimbursement of Milstein's expenses that she incurred in excess of the initial $2,500, but refused to provide additional funds for further investigation.

In support of Brown's state habeas application, Milstein submitted an affidavit in which she described the investigation that she had conducted. She also set out additional information she wanted to develop, including verification of Brown's mother's drinking, investigation of the possibility that Brown suffered from Fetal Alcohol Spectrum Disorder, corroboration of Brown's sisters' accounts of police manipulation, investigation of the possibility that drug rivals may have been involved in the murders, and an interview with Brown's common-law wife and mother of his children. According to Milstein, interviews must be conducted in person rather than by telephone so that trust and rapport between the investigator and witnesses can be developed. She further stated that repeat interviews were necessary in order to obtain affidavits.

The state habeas court concluded that Brown's claim that the denial of additional investigative funds rendered habeas counsel ineffective was not cognizable in state habeas proceedings. Although the Texas Court of Criminal Appeals did not adopt the trial court's findings and conclusions with respect to Brown's claims of inadequate funding, it denied relief on Brown's claim.

In his federal habeas petition, Brown raised several claims alleging constitutional violations based on the state court's refusal to provide additional funds for investigation. Although he acknowledged that those claims could not support a grant of federal habeas relief, he nevertheless asserted that the allegedly inadequate and unfair state court procedures were relevant to the district court's determination of the reasonableness of the state court's decision. He argued that the district court should review his ineffective assistance claim *de novo* and allow him an opportunity to develop the factual basis for his claim in federal court.

No. 11-70012

In his COA request in this Court, Brown argues that the district court failed to address his contention that inadequate funding should be considered in determining the reasonableness of the state court's decision. Brown asserts that he diligently sought to develop his claim in state court, but was prevented, as a result of his indigence, from completing the necessary out-of-state investigation. He argues that this denial of funding and the resulting inadequate investigation rendered the fact-finding process in this case seriously suspect. Finally, in a footnote, Brown asserts that in determining whether a claim has been "adjudicated on the merits," this court should consider the procedural fairness and whether the state court has provided a legitimate forum to decide important constitutional claims.

Contrary to Brown's assertion, the district court considered and rejected his contention. The district court held that a full and fair hearing in state court is not a prerequisite for deference to a state court under either 28 U.S.C. § 2254(d), or under § 2254(e)(1). The district court further held that the state procedures were not inadequate, stating:

> The Court finds that Brown has not shown that the state habeas process inadequately allowed for investigation into his background. State habeas counsel requested a reasonable amount of funds to investigate Brown's background. The Court of Criminal Appeals approved all the funds initially requested. The approved expenditures only resulted in one piece of admissible evidence, but many unsubstantiated allegations. Brown fails to explain why Ms. Milstein could not have acquired an affidavit to substantiate the hearsay statements she included in her report. He has not shown why the initial expenditure of funds was insufficient to secure additional affidavits from Brown's sisters as Ms. Milstein had with his mother. Brown's arguments would require the Court not only to supervise the expenditure of state funds, but superintend the efforts of a state-funded investigator. A review of the state process does not give much confidence that additional funds would have resulted in evidence admissible in court, or even meaningfully supporting his claim.

No. 11-70012

*Brown v. Thaler*, No. H-09-74 (Feb. 28, 2011), at 17-18.

Similarly, Brown has failed to persuade us that reasonable jurists would find debatable the district court's conclusion.[4] We now turn to consider Brown's request for a COA on his ineffective assistance of counsel claim.

### B.

In his COA application, Brown argues that his trial counsel rendered ineffective assistance by failing to investigate readily available mitigating evidence concerning his difficult childhood and troubled background, including his mother's alcohol abuse. He asserts that trial counsel should have retained mental health experts to evaluate his low intelligence and explore whether he suffers from Fetal Alcohol Spectrum Disorder.

Because Brown's ineffective assistance of counsel claim was adjudicated on the merits by the Texas Court of Criminal Appeals, the district court's consideration of Brown's claim was governed by 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[4] The Supreme Court's recent decision in *Martinez v. Ryan*, 2012 WL 912950 (U.S. Mar. 20, 2012), does not assist Brown's argument. In *Martinez*, the Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 2012 WL 912950, at *5. The Texas Court of Criminal Appeals did not find Brown's ineffective assistance claim to be procedurally defaulted, but instead considered the claim on its merits.

No. 11-70012

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Brown's ineffective assistance of counsel claim is governed by the clearly established law set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To have been entitled to relief from the Texas Court of Criminal Appeals, Brown had to

> show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.

"[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id*. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

9

challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal quotation marks and citations omitted).

With respect to the duty to investigate, which was at issue in *Strickland* and is also the focus of Brown's claim,

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. *See also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). The Supreme Court recently stated that these three post-*Strickland* cases, each of which granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 131 S. Ct. 770, 789-90 (2011). Brown's counsel were "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.

To demonstrate prejudice, Brown

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted).

"When a defendant challenges a death sentence, . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id*. When considering the prejudice prong, the state habeas court's task was to "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000).

For the district court, "[t]he pivotal question [was] whether the state court's application of the *Strickland* standard was unreasonable. This [question] is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 131 S. Ct. at 785. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 788. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id*. at 786 (internal quotation marks and citation omitted).

No. 11-70012

## C.

With these legal principles in mind, it is now time to consider the evidence presented at trial, and the evidence that Brown claims should have been discovered and presented by his trial counsel.

As we have already noted, at the punishment phase of Brown's trial, the State re-offered all of the evidence it had presented at the guilt-innocence phase. This evidence included that Brown had purchased marijuana and cocaine from Rachel Tovar and her husband in the past; that he and his accomplices went to Rachel Tovar's residence on June 20 to buy drugs; that they bound her and five others who were in her house with strips of sheets that Brown had cut with a knife; and that they placed the victims in various rooms in the house and then shot each one of them in the head, killing four of the six. The deceased included Rachel Tovar's husband, son, nearly nine-months pregnant daughter-in-law, and a neighbor. The State also presented evidence that Brown had committed an armed robbery in Tuscaloosa four years earlier; that he had extorted other prisoners while in the Harris County Jail awaiting trial; and that he had assaulted a deputy at the Harris County Jail.

Brown's trial counsel, Patricia Saum and Tom Moran, called only one witness at the punishment phase: Dr. Peter Lewis, a professor at South Texas College of Law. Dr. Lewis, who has a Ph.D. in criminology, explained the concept of "maturational reform," the theory that youthful offenders become less violent as they age. He testified that maturational reform has a greater impact on violent offenders than non-violent offenders and that a structured environment, such as custody, seemed to be an important factor in the decrease in violence. Trial counsel also introduced into evidence Brown's school records, which showed that he was in special education classes; that he repeated the ninth grade; that he scored 70 on an IQ test in the third grade, 88 in the sixth

grade, and 87 in the ninth grade; and that teachers reported that he was sometimes overactive physically, impulsive, and distractible.

At the bench, trial counsel put on the record that she had asked Brown's mother to stay and testify, but that Brown had told his mother to go home because he did not want to put her through testifying. Brown stated on the record that he did not want to call his mother as a witness. The prosecutor pointed out that Brown's sister, Carolyn Momoh, was present. In response to a question from the trial court, trial counsel acknowledged the presence of other family members, but stated that the defense was going to rest without calling any of them as witnesses.

As the state habeas court pointed out, in addition to the evidence presented at the punishment phase of the trial, trial counsel's cross-examination of Brown's sister, Serisa Ann Brown, during the guilt-innocence phase of the trial also resulted in the presentation of some mitigating evidence. Serisa testified that she met Brown's attorney, Saum, a month earlier when Saum was in Alabama for four days, and that Saum also met with Brown's other sisters, Grace and Carolyn, as well as Serisa's daughter and Brown's mother and father. Serisa also testified that Brown had 32 brothers and sisters; that Brown's mother was present in the courtroom during the trial; that Brown was only 23 years old; that Brown had three children; and that Brown was close to the mother of his three children, SaDonah, A. J., and Josh.

In her closing argument, Saum addressed the lack of testimony from Brown's family members as follows:

> I apologize if any of y'all wanted to hear from [Brown's] family and you didn't get to because I didn't put anybody on. I don't see how putting anyone on from [Brown's] family is going to help you make a decision. Because anyone who would testify would tell you don't kill my son.

Saum made the following argument on mitigation:

No. 11-70012

I'm going to ask you when you're considering the mitigating circumstances to go back and look at Defendant's Exhibit No. 132. They are the school records of Arthur Brown. They will tell you something about Arthur Brown and his background and his special education and when he dropped out of school and what kind of learning disability he had. And those again are things that you can take into consideration in determining his background and his moral culpability.

Once again, there's not a lot that anyone can say at this point. You have made a decision that based on the evidence that you heard that you believe that Arthur Brown is guilty of capital murder. Now, you have to go back with the same burden of proof and answer Special Issue No. 1, Special Issue No. 2, and you don't have a burden of proof on Special Issue No. 3. I would ask that you consider all of the evidence and I would ask you that you think about the circumstances of the offense and consider that when you have capital murder there's a wide range of ways that it can be committed.

If you have victims that were just walking down the street and didn't have any criminal acts that they were committing themselves, that could subject them to life in prison. That that might be a different consideration as far as circumstances, but that the circumstances in this case surrounding the crime are significant. And I would ask you to consider them and I would ask you to answer Special Issue No. 1 no and Special Issue No. 3 yes, that [there] are mitigating circumstances.

In response, the State argued that Brown's school records contained no mitigating evidence: "He's got an 80 IQ. There's no reason he can't function. There's no reason he can't conform his behavior to the requirements of society other than he doesn't care." The prosecutor also argued that nothing in Brown's background or character was mitigating: "[H]e's an armed robber . . . a major drug dealer in Tuscaloosa, Alabama. That's his background. That's his character."

14

No. 11-70012

In his state habeas petition, Brown alleged that his trial counsel rendered ineffective assistance by failing to retain an investigator or mitigation specialist to investigate the case and his background and character. He also alleged that counsel were ineffective because they did not use any experts to assist in developing a mitigation case. In support of these allegations, he submitted only the affidavits of his mother and Lisa Milstein, the investigator retained by his state habeas counsel.

As we have already noted, Brown's state habeas counsel retained Lisa Milstein to investigate guilt-innocence issues, as well as Brown's family background and personal circumstances. Milstein obtained only one affidavit, from Brown's mother. According to Milstein's affidavit, submitted to the state habeas court, she traveled to Tuscaloosa, where she interviewed Brown's mother, his father, three of his sisters, and one of his brothers. Milstein explained that these were merely preliminary interviews and that she anticipated that another trip to Tuscaloosa would be necessary. She stated that she planned to secure affidavits from Brown's family members on the second trip, but was unable to return to Tuscaloosa because the state habeas court refused to provide additional funds. Milstein obtained a handwritten affidavit from Brown's mother concerning her alcoholism, but did not obtain any other affidavits. She was unable to interview the remainder of Brown's family or obtain work history and medical records.

In her affidavit, Milstein described the information she had learned from interviewing Brown's family. Milstein stated that Brown's mother, Joe Mae Brown, stated that Brown's trial counsel, Saum, met with her prior to trial, but did not question her about Brown's family, background, and life history. Mrs. Brown told Milstein that when Brown was three years old, he fell from a swing and struck his head on a cement porch. Mrs. Brown took him to a hospital, where the attending physician determined that he had a concussion. Milstein

15

stated that Mrs. Brown told her that Brown had headaches two to three times a week for several months after the concussion, but they never took him for a follow-up visit with the doctor.  Mrs. Brown also told Milstein that she was married to Brown's father when Brown was born, but that they divorced when he was twelve years old; that during the marriage, Brown's father beat her; that Brown was close to his father, and she started having problems with Brown after the divorce; and that Brown threatened to commit suicide by jumping out of a window at his school.

According to Milstein, she did not learn of Brown's mother's history of alcohol abuse while interviewing Mrs. Brown, but learned of it later from interviews with other family members.  Milstein stated that Brown's sister, Serisa, told her that Mrs. Brown often went out drinking at night, leaving the children alone at home, and returning heavily intoxicated in the early morning. Sometimes when she returned home she woke the children and made them pray throughout the rest of the night.  As a result, the children were frequently tired at school.  According to Milstein, Grace Brown, another of Brown's sisters, stated that Brown was exposed to his mother's drinking as a child and was embarrassed by her appearance in public while drunk.  Milstein said that Grace also told her that after the divorce, their mother's drinking friends came around more often.

Milstein stated that when she confronted Mrs. Brown, Mrs. Brown admitted that she drank on a daily, or near daily, basis; that she drank heavily throughout her pregnancy with Brown; and that she obtained homemade bootleg whiskey from one of her sisters.  Milstein believed that Mrs. Brown was likely an alcoholic.  In her handwritten affidavit, Mrs. Brown stated that she drank while pregnant with Brown, at least every weekend and often during the week. She estimated that she consumed at least a pint of bootleg whiskey or brandy. Milstein believed that Mrs. Brown's alcohol abuse during her pregnancy with

No. 11-70012

Brown was an important mitigating fact, because it might have caused organic brain damage called Fetal Alcohol Syndrome or Fetal Alcohol Effect.

Milstein reported that she learned from her investigation that Brown had an impoverished upbringing. After his parents' divorce, he lived with his mother and three other siblings in a small apartment in a poor area of Tuscaloosa, in a neighborhood that contained drugs and violence. According to Milstein, Brown's childhood was one marked by deprivation, including lack of food, clothing, guidance, and a father figure. Brown was devastated by his parents' divorce and was left in the hands of a drunken and abusive mother.

Milstein stated that Brown had a stable relationship in Tuscaloosa with his common-law wife and that he worked at legitimate jobs to provide for her and their three children. Milstein stated that Brown's sister Grace told her that Brown had an intense work ethic and had on occasion worked two jobs at once to support his family. Milstein reported that each of Brown's sisters told her that Brown's trial counsel did not ask them any questions regarding mitigating evidence.

More than four years after Brown filed his state habeas application, the State filed a motion in which it requested that the trial court order Brown's trial counsel to file an affidavit summarizing counsel's trial strategy regarding investigation and preparation for the punishment phase of the trial. The trial court granted the State's motion. Brown's lead trial counsel, Patricia Saum,[5] filed a two-page affidavit recounting her recollection of her representation of Brown. Her affidavit stated:

> The offense in the case occurred in June of 1992. Arthur was arrested several months later. The trial of the case occurred approximately nine months after Arthur's arrest. Between

---

[5] Saum married after Brown's trial and her affidavit contains her married surname, "Nasworthy." In order to avoid confusion, we, like the district court, will refer to her as Ms. Saum.

17

No. 11-70012

November 1992 and the start of trial in 1993, I spent many hours at the Harris County District Attorney's Office reading and taking detailed notes of every portion of the many police reports from the Houston Police, Alabama Police, FBI and all lab reports.

I gave Arthur several large legal pads and asked him to write out his entire family history for me – the good, the bad and the ugly. Arthur wrote out 14 single spaced sheets of information. Arthur's writings were coherent, intelligent, and very descriptive. He was able to give me detailed information regarding his childhood, his parents and his school years.

Since Arthur did not testify at trial, and I have not requested nor received permission from Arthur to release this information, I am asserting that the information provided to me by Arthur is privileged information as both attorney-client communication and the attorney work-product.

I made two trips to Tuscaloosa, Alabama. During those two trips, I went to the library and pulled every newspaper article written about the case to see if there were additional witnesses that had not been mentioned in the police reports. I went to the County courthouse and researched the criminal background relating to Arthur, his co-defendants, and the other potential suspects. I met with the Tuscaloosa detectives, viewed their physical evidence. I interviewed at least one of the potential suspects in the Tuscaloosa jail. I also met with Arthur's probation officer who was supervising him while he served his probation for an aggravated robbery case committed in Tuscaloosa. I also met with another defense attorney who shared information about a shooting, not involving Arthur, which resulted in the discovery of the murder weapon from this case.

I then met and interviewed Arthur's sisters, (Serisa Brown, Grace Brown and Carolyn Momoh), his mother, father and girlfriend. We discussed the statements given by the sisters to the police in Houston and in Tuscaloosa and the conflicts within those statements and the sisters' beliefs that the statements were coerced.

I learned that Arthur attended a total of 6 different schools up through the 10th grade. I had the name of a contact person,

No. 11-70012

Eleanor Wells, at Central High West and a special education teacher, Dr. Jane Searcy. I did not subpoena either of these witnesses for punishment testimony because I did not have any information that Arthur was of sufficiently low IQ to have affected his ability to determine right from wrong.

When it came time to put on punishment evidence, I wanted to put Arthur's mother on the stand to let the jury get to know Arthur and his background and to have her ask the jury to spare his life. Much to my dismay, Arthur requested that his mother not be called to testify. Arthur stated to me and to the court that he did not want to put his mother through the stress of testifying. I informed the court of Arthur's decision and, to the best of my recollection, the court verified on the record that this was Arthur's decision. (One of the newspaper articles attached to Arthur's Petition for Habeas Corpus refers to this hearing outside of the presence of the jury. See Exhibit L.) Arthur's sisters had been so shaken by their treatment on the witness stand during the guilt phase of the trial, they did not want to testify at the punishment phase and risk further contempt proceedings. I believe that Arthur's brother did testify at punishment.[6]

My strategy during the trial was focused on guilt/innocence. With 6 persons shot execution style and 4 of the 6 dead, including a pregnant teenager, I did not believe that there was any punishment evidence which would mitigate in favor of life. Due to the other drug dealers from Alabama who were in Houston at the same time to buy drugs from the Tovar family, I hoped to put some reasonable doubt into the record as to which drug dealers committed the crime. The jury, however, believed the 2 surviving victims when they identified Arthur as one of the gunmen. One of the jurors was quoted in the newspaper as saying "There was no reason for the shootings. When they tied those people up, they could've walked out of there with all their money, their drugs, their TV, anything they wanted, even the pet dog, but there was no reason to shoot them. What were they going to do, call the police and say someone just stole my cocaine and marijuana?" (See Exhibit L).

---

[6] Contrary to Saum's recollection in her affidavit, Brown's brother did not testify at either phase of Brown's trial.

19

No. 11-70012

The state habeas court found that Saum's affidavit was credible, and accepted her explanation that she had made a thorough investigation of the facts, including interviewing Brown's family members, researching his educational history, and reviewing his criminal history.  The state habeas court found that Saum had interviewed Brown about his childhood, education, and family and had obtained detailed information from Brown about his background; that Saum had traveled to Tuscaloosa twice, where she reviewed police reports, researched criminal histories of Brown, his co-defendants, and other potential suspects, met with police, viewed physical evidence, met with Brown's probation officer, investigated Brown's educational background, and interviewed Brown's mother, father, sisters, and girlfriend.  The court found that Brown had prevented his trial counsel from calling his mother as a witness, and that his sisters had been so shaken during their guilt-innocence phase testimony that they chose not to testify during the punishment phase.

In his response to the State's summary judgment motion in federal court, Brown submitted the affidavit of Dr. Natalie Novick Brown to support his claim that trial counsel should have retained an expert to determine whether he suffers from Fetal Alcohol Spectrum Disorder.  In her affidavit, Dr. Brown stated that "there is abundant preliminary information to support a conclusion that an FASD diagnosis is LIKELY and that a multidisciplinary diagnostic assessment to address this issue should be undertaken."  Dr. Brown's affidavit was not provided to the state habeas court.

The district court stated that, aside from obvious concerns about the exhaustion of remedies, Brown had not shown that a reasonable attorney would have focused on this double-edged mitigation theory, or that the Texas courts would have approved funds for the inquiry which would cost well over $20,000, or that the information would have made any difference to the sentencing jury.

No. 11-70012

A few months after the district court filed its opinion, the Supreme Court held that federal habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. Accordingly, to prevail on his ineffective assistance claim, Brown "must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id*. at 1400. Thus, because Dr. Brown's affidavit was not presented to the state habeas court, the district court could not have considered it in determining whether the state court's rejection of Brown's ineffective assistance claim was reasonable.

The district court analyzed the state habeas court's decision in detail, observing that the state habeas court had provided five reasons for denying relief on Brown's ineffective assistance claim:

First, the state habeas court found that, considering the "horrific nature of the offense wherein six people were shot execution style, resulting in four deaths, including that of a pregnant teenager," Brown's trial counsel had made a reasonable strategic decision to focus their efforts on the guilt/innocence phase rather than punishment. The district court observed that winnowing out weaker arguments to maintain credibility with the jury is an effective strategy and that trial counsel did not completely forego a mitigation defense, but instead chose to focus their investigation on creating reasonable doubt that Brown had committed a particularly violent offense. We note that although the jury ultimately did not find it persuasive, Brown's counsel adduced evidence that rival drug dealers from Tuscaloosa, who were also customers of the Tovars, had been in Houston around the time of the murders; and that another drug dealer from Tuscaloosa, who was deceased by the time of Brown's trial, had possessed both of the murder weapons subsequent to the murders. The district court cited Fifth Circuit precedent recognizing that "residual doubt may be a reasonable, even highly beneficial, strategy in a capital case." *Martinez v. Quarterman*, 481

F.3d 249, 256 (5th Cir. 2007) (citing *Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999)).

Second, the state habeas court found that trial counsel effectively presented mitigation evidence through the admission of Brown's school records, the expert testimony of Dr. Lewis on the concept of maturational reform, and the cross-examination of Brown's sisters during the guilt-innocence phase. The district court concluded that, although the evidence presented at trial differed from that contained in the admissible habeas evidence, the jury nevertheless saw that Brown's background could mitigate against a death sentence.

Third, the state habeas court found that Brown's trial counsel had hoped to call Brown's mother as a witness at the punishment phase to testify about Brown and his background and to make a plea for mercy, but Brown asked her to go home because he did not want her to testify. The district court agreed that Brown himself prevented trial counsel from presenting testimony from the only individual who had provided competent evidence to support his ineffective-assistance claim. The state habeas court also found that Brown's sisters did not testify at the punishment phase because their testimony for the State during the guilt-innocence phase had left them "shaken" and "fearful". The district court noted that one of the sisters, Carolyn Momoh, had committed perjury and had later pleaded guilty to criminal charges. The district court pointed out that trial counsel had observed the sisters' testimony and evaluated their state of mind, and that their prior testimony "could certainly give a defense attorney pause when considering what they would add to the punishment phase." The district court held that Brown had not shown that the sisters would have testified even if trial counsel had tried to question them about their recollections of Brown's background and his mother's alcohol abuse.

Fourth, the state habeas court concluded that trial counsel did not perform deficiently by not calling some witnesses, including one of Brown's special

education teachers.  The district court held that this conclusion was not unreasonable because trial counsel had admitted Brown's school records , which allowed the jury to see that he had low intelligence, and in closing argument trial counsel had urged the jury to look at his special education background and poor performance in school as a mitigating factor.

Finally, the state habeas court concluded that Brown had not shown prejudice.  The district court held that the state court's decision is not unreasonable.  The district court stated that, even considering Milstein's hearsay-based statement and Brown's mother's affidavit as a valid measure of what trial counsel should have presented, the evidence Brown claimed should have been presented was not of such persuasive character that it would have influenced the jury's appraisal of his moral culpability.  The district court stated:

> Plugging the new mitigating evidence into the case before the jury does not suggest a reasonable probability of a different result. Brown participated in an extremely violent attack and showed little remorse for his actions.  While the trial evidence could not conclusively identify which man shot each victim, eyewitnesses saw Brown brandishing a weapon like that used in the killing and he played a major role in the crime.  Brown obviously intended that six people would die, including a pregnant teenager.  He had a criminal record and a history of involvement in the drug culture.  His violence extended into the prison environment where he extorted other inmates and attempted violence against prison guards.
>
> Against those aggravating factors, Brown wishes that trial counsel had adduced evidence of his troubled, impoverished, and disadvantaged background.  The jury had a peek into the difficult circumstances swirling about his early life, but did not have a plenary consideration of how that affected Brown.  Nonetheless, the lawlessness of his violent life ensures that the state habeas court would not be unreasonable in concluding that Brown's unpresented mitigation evidence would not end in a reasonable probability of a different result.

*Brown v. Thaler*, No. H-09-74 (Feb. 28, 2011), at 24-25 (footnote omitted).

No. 11-70012

The district court concluded that the state habeas court was not unreasonable in finding no *Strickland* deficient performance or actual prejudice and that its decision was not contrary to, or an unreasonable application of, federal law.

Brown argues that, considering only the evidence before the state habeas court – Milstein's affidavit and his mother's handwritten affidavit – there are serious questions whether trial counsel made any inquiries of his family about his background and family history.  He asserts that Saum's affidavit failed to resolve these serious questions.  Under *Strickland*, however, there is a strong presumption that counsel's performance was competent, and Brown bore the burden of demonstrating that counsel's performance was deficient.  *Strickland*, 466 U.S. at 689.  The state habeas court was "required not simply to give [Brown's] attorneys the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [Brown's] counsel may have had for proceeding as they did." *Pinholster*, 131 S. Ct. at 1407 (internal quotation marks and citation omitted).  The evidence that Brown claims his counsel should have presented is "double-edged" because, although it "might permit an inference that he is not as morally culpable for his behavior, it also might suggest [that he], as a product of his environment, is likely to continue to be dangerous in the future." *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002).  Therefore, "it is uncertain whether reasonable counsel would have used the evidence had it been available." *Id.* Furthermore, the aggravating evidence was overwhelming. *See id.* (stating that where evidence of future dangerousness is overwhelming, "it is virtually impossible to establish prejudice").  Brown and his accomplices bound and shot six-people in the head, execution-style.  Although two of the victims survived, one of the four who died was a nearly nine-months pregnant teenager.  Considering the circumstances of the crime, the state habeas court reasonably could have concluded that it is unlikely that the mitigating evidence Brown

24

claims his counsel should have presented would have had a significant mitigating effect had counsel presented it.

We thus conclude that reasonable jurists would not find debatable the district court's decision that the state habeas court (1) reasonably could have found that Brown prevented his trial counsel from presenting his mother's testimony in mitigation, and (2) reasonably could have concluded that Brown's counsel, after conducting an adequate investigation under the circumstances, reasonably could have decided that a mitigation defense would be a double-edged sword and that the best chance to save his life was to try to persuade the jury that Brown would not be dangerous in the future if he were imprisoned for life. Reasonable jurists also would not find debatable the district court's decision that the state court reasonably could have concluded that, even if counsel performed deficiently, Brown was not prejudiced, because there is no reasonable probability that, had the jury heard the evidence contained in Brown's mother's affidavit and in Milstein's statement, it would have answered affirmatively the special issue on mitigating circumstances.

## III.

We end here.  Brown has not demonstrated that reasonable jurists would find the district court's assessment of his claims debatable or wrong, or that the issues presented are adequate to deserve encouragement to proceed further. Accordingly, Brown's request for a COA is

DENIED.