# .IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-DR-01224-SCT

*ALBERTO JULIO GARCIA a/k/a ALBERTO J.*
*GARCIA a/k/a ALBERTO GARCIA*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/25/2017 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | JOEL SMITH |
| | WILLIAM CROSBY PARKER |
| | ANGELA BROUN |
| | BILLY EDWARD STAGE |
| | LISA D. COLLUMS |
| | ALEXANDER DUNLAP MOORHEAD |
| | KASSOFF |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR PETITIONER: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: TREASURE R. TYSON |
| ATTORNEYS FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ASHLEY LAUREN SULSER |
| | BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 02/16/2023 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Alberto Garcia confessed to raping and murdering five-year-old JT. *Garcia v. State (Garcia I)*, 300 So. 3d 945, 952 (Miss. 2020). He pled guilty to capital murder and waived jury sentencing. After a hearing, the trial judge sentenced Garcia to death. *Id.* He appealed his sentence, and we affirmed. *Id.* He now seeks post-conviction relief from his sentence or leave to proceed in the trial court for further post-conviction proceedings.[1]

¶2. In his motion, Garcia argues his trial counsel provided constitutionally ineffective assistance. While he asserts his attorneys were deficient for three reasons, his primary claim is that counsel failed to pursue and present at the sentencing hearing evidence of fetal alcohol syndrome disorder (FASD) as a mitigating factor. After review, we find Garcia has failed to present a substantial showing that his trial attorneys were deficient in investigating potential FASD, let alone that any prejudice resulted. This is not a case in which counsel failed to obtain medical records, psychological histories, or assistance of a psychological expert. Instead, counsel pursued all these avenues of mitigation evidence. Moreover, courts have rejected Garcia's suggestion that FASD is akin to intellectual disability, making one morally less culpable. Instead, FASD evidence can indeed be "double-edged"—just as likely to be aggravating as mitigating.[2] For this reason, there is no reasonable probability that FASD evidence would have caused the sentencing judge to find that the mitigators outweighed the aggravators, which included the heinous nature of Garcia's crime.

---

[1] Garcia also requests oral argument on his motion, which we deny.

[2] *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (quoting *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002).

¶3.     We likewise find Garcia failed to show deficiency and resulting prejudice on his other two ineffective-assistance-of-counsel claims.

¶4.     We deny his motion.

## Background Facts and Procedural History

### I.     Garcia's Confession and Capital Murder Guilty Plea

¶5.     Police found five-year-old JT's body in an abandoned trailer. *Garcia I*, 300 So. 3d at 952. She had been sexually assaulted, vaginally and anally, and hanged by the neck. *Id.* Garcia confessed to killing her in the course of raping her. *Id.* at 959. His DNA was found in her vagina and anus. *Id.* at 952. He pled guilty to capital murder and waived jury sentencing. *Id.* at 959-60.

### II.     Sentencing Hearing

¶6.     A three-day sentencing hearing was held.

#### A.     State's Evidence

¶7.     At the sentencing hearing, the State reintroduced all of the guilt-phase evidence. So the sentencing judge had before her evidence of JT's disappearance, the later discovery of her hanged body in a filthy abandoned trailer, and the condition of her body—including defensive scratches to her neck from trying to free herself and trauma from being penetrated in her vagina and anus. There was also evidence that JT was still alive while Garcia violently raped her.

3

¶8.    Garcia's friend and neighbor, Julian Casper Gray, was an initial person of interest due to a tip.  But Garcia approached officers who were searching Gray's apartment.  Garcia volunteered that he had information.  And he willingly went to the police station to give a statement.  He gave several voluntary statements and confessions to law enforcement.  His versions shifted several times.  First, he said he had been in the trailer days before the crime and masturbated in there, so his DNA would be found at the crime scene.  Then, he claimed he blacked out and awoke with feces on his penis and thighs.  And finally, at his plea colloquy, he said Gray had asked for his help and led him to the trailer where JT was already bound.  Though his versions varied, Garcia did confess he penetrated JT anally and then "freak[ed] out" because he believed she was dead.  He told the judge that he and Gray then moved what he thought was JT's dead body to the bathroom to wash her and then hung her up to dry.

¶9.    The State also introduced evidence that matched Garcia's DNA to semen found in JT's vagina.  This DNA evidence excluded Gray as a match.

### B.    Garcia's Mitigation Evidence

¶10.   As part of Garcia's mitigation evidence, his trial counsel and their mitigation experts interviewed approximately sixteen people.  Ultimately, trial counsel called two mitigation witnesses—(1) clinical and forensic psychologist Dr. Robert M. Storer and (2) Gray's former girlfriend, Heather Hobby.  A couple from Florida, the Raymonds, with whom Garcia had lived for a time, were also present at the hearing and available to testify.  But Garcia chose

4

not to call them as witnesses, insisting he did "not wish to have them burdened" with "my problem."

### 1. Hobby

¶11. Hobby testified that she provided the tip to police about Gray after she learned of JT's abduction. Gray, like Garcia, lived in JT's apartment complex. And Gray had a history of child pornography and sexual abuse. Hobby, who had lived with Gray for nine months, then relayed how Garcia visited Gray's apartment daily. She described Garcia and Gray's relationship as "very odd"—"like a married couple." She then detailed how Gray ordered Garcia to perform household chores and how Garcia would comply. In Hobby's view, it was not a healthy friendship.

¶12. But as far as Garcia himself, Hobby never had negative interactions with him.

¶13. In a post-sentencing-hearing motion, Garcia argued he should have been allowed to introduce Hobby's hearsay statement to the police about why Gray should be investigated. The trial judge denied this motion, finding the rules of evidence still applied to sentencing hearings. The judge noted that, because she served as both the trial judge and sentencer, she had already heard more than a jury would have been allowed to hear about Gray's use of child pornography and violence. Finally, even if Gray was the actual abductor, this did not excuse Garcia's admitted rape and participation in strangling JT.

### 2. Dr. Storer

¶14.    Garcia's psychological expert, Dr. Storer, provided the bulk of Garcia's mitigation evidence.  Dr. Storer conducted more than fourteen hours of in-person interviews with Garcia.  He also spoke to four of Garcia's siblings and two of his aunts.  And he unsuccessfully attempted to interview two more sisters.  Dr. Storer was able to interview Garcia's close friend, Alvah Raymond, as well as Garcia's former foster parent.

¶15.    Because of inconsistent information, Dr. Storer looked for "converging data."  The "best source of information," he believed, was the voluminous records from eight-year-old Garcia's months-long stay at Miami Children's Hospital.  From his investigation, Dr. Storer prepared a sixty-three page report.   The lengthy report was sealed and made part of the record.

¶16.    Dr. Storer's wide-ranging report and testimony delved into Garcia's family history and childhood.

¶17.    Much of Garcia's family history focused on his mother, who had nine children by four different fathers.  She had a history of alcohol and drug abuse and had abused drugs while pregnant. Garcia's mother also struggled with mental-health issues, including schizophrenia, and had "some odd religious beliefs" that apparently syncretized Catholicism and witchcraft. She had a series of relationships with abusive men, including a drug dealer.  Garcia and his siblings had an unstable home life, with seasons of poverty, neglect, and abuse.  At least once, social services removed the children and placed them in foster care.  Garcia claimed one foster parent abused him.

6

¶18.   As to Garcia himself, there was evidence of self-isolation and violent tendencies, starting at an early age.   Like his mother, he suffered with mental-health problems, experiencing psychotic episodes in which he claimed he talked to the devil.   At eight years old, Garcia was admitted to the hospital for a psychotic disorder.   According to Dr. Storer, Garcia's hospital records revealed "an extremely disturbed child."   Around this same time, Garcia began drinking alcohol.   By age ten, Garcia was using marijuana.

¶19.   Garcia struggled in school, eventually dropping out and getting his GED.   He also experienced periods of homelessness.   Garcia's work history was sporadic.   Garcia told Dr. Storer he would often quit to have more time to pursue his obsessive sexual interests.   His Xbox 360 game console, which was confiscated during the criminal investigation, revealed voluminous internet searches for pornography, including child pornography.   Dr. Storer connected Garcia's obsessive and compulsive sexual behavior to Garcia's adverse childhood experiences.

¶20.   At trial, Dr. Storer gave three diagnoses for Garcia. The first was an anxiety disorder—probably social anxiety disorder.   But Dr. Storer made clear that no "episode of [Garcia's] anxiety disorder" had caused Garcia to rape and murder JT.   The second diagnosis was "masochistic paraphilic disorder."   "Masochism," Dr. Storer explained, is when "people get sexual arousal and pleasure out of being tied up, controlled, denigrated in some way, shape, or form."   And "a paraphilic disorder is involved when those desires and activities actually get in the way of, quote, unquote, normal sexual activity."   The third diagnosis was

7

"sadistic sexual paraphilic disorder." "Sadism," according to Dr. Storer, "is the controlling, the domination, the infliction of pain on someone else for sexual satisfaction."

¶21.    Even so, Dr. Storer's report concluded that Garcia "did not endorse or demonstrate symptoms of a severe and persistent mental illness during [his] interviews with [Garcia] nor did psychological testing indicate such an illness." "[T]he hallmark symptoms of genuine mental illness and of a psychosis," Dr. Storer explained, "are hallucinations, delusions, disorganized behavior." Yet Dr. Storer pointed out that "[n]owhere in the [children's hospital] records are there hallucinations, delusions, or disorganized behavior documented by Mr. Garcia," he said. Still more, Dr. Storer neither deemed Garcia a sociopath nor diagnosed him with antisocial personality disorder.

¶22.    Psychological testing showed no deficits in Garcia's competence-related abilities. His Full Scale IQ score was 101.

¶23.    In sum, Dr. Storer listed fourteen mitigators based on Garcia's history:

(1)    "Chaotic family environment in early childhood (father figures, siblings, and other persons coming in and out of the home)";

(2)    "Maternal neglect, absence, and abandonment";

(3)    "Maternal mental health problems";

(4)    "Maternal substance use problems";

(5)    "Father figure alcohol abuse";

(6)    "Exposure to domestic violence between mother and father figure";

(7)    "Homelessness";

8

(8)    "Physical and sexual abuse, home and foster care";

(9)    "Substance use beginning in childhood (Alcohol at age 9, Marijuana at age 10)";

(10)   "Taken from home and family members and placed in [f]oster care system";

(11)   "Social/Interpersonal difficulties";

(12)   "Behavioral problems leading to hospitalization at age 8";

(13)   "Diagnosed with Oral language Disorder at age 8"; and

(14)   "Anxiety Disorder symptoms present since childhood."

### C.    *Judge's Sentence*

¶24. At the conclusion of the hearing, the trial judge determined the mitigating circumstances were insufficient to outweigh the aggravating circumstances. Thus, she sentenced Garcia to death. *Id.* at 960-63.

¶25. Judge Dodson began by observing that Garcia's "story changed as time went on, and has continued to change up to the time of his plea . . . ." And she found that, "regardless of whether Mr. Gray was involved," Garcia was "responsible for his own actions. He is responsible for that sexual battery, and he is responsible for that death." Judge Dodson also deemed Garcia's lack of remorse inexcusable:

> He has never one time made a statement with regard to the fact that this was a horrible thing that happened, even at the time that he was crying and upset and saying that someone else did all of this and he simply helped to cover it up.
>
> A normal person, an average person would have said, this is a terrible thing. He never did. And so I take that into consideration as well.

9

¶26. Judge Dodson then found beyond a reasonable doubt that Garcia killed JT and that two aggravating factors existed: (1) the killing occurred in the commission of sexual battery, and (2) it was "especially heinous, atrocious, and cruel." *Id.* at 952. In fact, having "seen many cases and read many others," Judge Dodson described Garcia's crime as "one of the worst in terms of what happened to [JT] and her ensuing death." DNA evidence implicated Garcia, and the judge noted there was "every reason to believe that [JT] was conscious during at least some portion of the sexual assault." Dr. LeVaughn testified that the assault would have "caused her pain and . . . terror." And the young girl's "death by hanging was not instantaneous." Instead, there was evidence "[JT] may have scratched herself at some point trying to remove the ligatures. Judge Dodson found that JT "suffered significant physical and mental pain and suffering before her death and that the sexual battery and killing . . . was brutal, cold and torturous."

¶27. As for mitigation, Judge Dodson found three mitigating factors. *Id.* at 952. First, Garcia had "no significant criminal history." Second, he was still young. And third, he had "some mitigation with regard to his formative years":

> [Garcia] has provided substantive and substantial information concerning his childhood years. An[d] by that I include his teen years, as well as his family dynamics.
>
> . . . .
>
> [H]e had what can at least be described as a difficult childhood including a mother who had a substance abuse problem. There was violence in the home. He was removed from the home by child services. He was homeless at some

10

point. And basically he had no good, stable family or home life for substantial periods of his childhood.

It is also clear that he had difficulties following the rules and had violent tendencies even as a young child. Those violent tendencies were directed both to animals, killing cats in particular, and to human beings, there being statements concerning assaults on both his brother and his mother as well as others while he was hospitalized.

He apparently, at some point, also had an obsession concerning sex. However, the court notes he was able to overcome that by leaving the environment in which he was living. I believe the testimony was he went to New Jersey for a period of time. Unfortunately, he returned to the environment he had been in as a young adult and apparently resumed whatever that obsession was.

There is clearly indication he should have had ongoing mental health care and did not receive it. However, he's now sufficiently old enough, and at the time of the crime was 29 and was fully able to seek that help on his own should he have needed it.

¶28. The judge also pointed out that however horrible Garcia's childhood and mother might have been, he had forgiven his mother and seemed very close to her. In fact, it was his mother who had convinced Garcia to make a second statement to police. And his "crying and sobbing" during that interview "was predominately as a result of the fact that he did not think he was going to be able to see [her] again in the free world before something happened to her."

¶29. But the judge did reject one purported mitigating factor—that Garcia committed the crimes while "under the influence of extreme mental or emotional disturbance." The trial judge found "absolutely no evidence" of that. She acknowledged that Garcia suffers from an anxiety disorder but found that disorder had nothing to do with the crimes.

11

### III. Appeal and Post-Conviction Petitions

¶30.   Having pled guilty, Garcia had no right to appeal his conviction. *Id.* at 952 n.1 (citing Miss. Code Ann. § 99-35-101 (Rev. 2015)).  So he appealed his sentence only, and this Court affirmed. *Id.* at 952.

¶31.   While his sentence-related direct appeal was pending, Garcia petitioned the trial court for post-conviction relief to challenge his guilty plea.[3]  The trial court denied Garcia's petition. Garcia's appeal of that denial is pending separately before this Court.  *Garcia v. State (Garcia IV)*, No. 2021-CA-01214-SCT.

¶32.   Immediately after we affirmed Garcia's death sentence, we appointed to Garcia the Office of Capital Post-Conviction Counsel, which has filed the present motion on Garcia's behalf.  Garcia argues that his trial counsel were ineffective for three reasons:

(1)   trial counsel failed to "pursue and present a mitigating defense of [FASD], which can only be presented with proper expert testimony";

(2)   trial counsel failed to "present and explain all the available mitigating evidence"; and

(3)   trial counsel failed to "develop and present evidence about [Julian Casper Gray's] substantial domination of [Garcia] during the crime as part of [their] case for mitigation."

### Standard of Review

---

[3] The Mississippi Attorney General had filed in the guilty-plea PCR action a "Motion for Notice of and an Opportunity to Be Heard on Requests for Litigation Expenses."  The trial court granted the motion, and Garcia petitioned for permission to file an interlocutory appeal. We granted Garcia's petition and reversed the trial court's order.  *Garcia v. State (Garcia II)*, 344 So. 3d 273 (Miss. 2022).

¶33. When presented with a petition for permission to file a PCR motion in the trial court, we grant leave to proceed "only if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they 'present a substantial showing of the denial of a state or federal right.'" ***Ronk v. State***, 267 So. 3d 1239, 1247 (Miss. 2019) (quoting Miss. Code Ann. § 99-39-27(5) (Rev. 2015)). We accept well-pleaded allegations as true. ***Id.*** And in capital cases, we review nonprocedurally barred claims using "'heightened scrutiny', under which all *bona fide* doubts are resolved in favor of the accused." ***Porter v. State***, 732 So. 2d 899, 902 (Miss. 1999) (quoting ***Balfour v. State***, 598 So. 2d 731, 739 (Miss. 1992)). As we have acknowledged, "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." ***Irving v. State***, 361 So. 2d 1360, 1363 (Miss. 1978) (citing ***Forrest v. State***, 335 So. 2d 900 (Miss. 1976); ***Russell v. State***, 185 Miss. 464, 189 So. 90 (1939)).

¶34. But after examining the application, we have "the authority to dismiss it outright, 'if it plainly appears from the face of the motion, any annexed exhibits[,] and the prior proceedings in the case that the movant is not entitled to any relief . . . .'" ***Neal v. State***, 525 So. 2d 1279, 1281 (Miss. 1987) (quoting Miss. Code Ann. § 99-39-11(2) (Supp. 1986)).

**Discussion**

¶35. "Criminal defendants," like Garcia, "are entitled to effective assistance of counsel." ***Ronk***, 267 So. 3d at 1247. And the United States Supreme Court has established a two-part test for determining an ineffective-assistance-of-counsel claim. ***Doss v. State***, 19 So. 3d

13

690, 694 (Miss. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

¶36. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Whether a defendant can establish deficient performance is based on an objective standard of reasonableness. *Ross v. State*, 954 So. 2d 968, 1003 (Miss. 2007). "Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance." *Id.* at 1004 (citing *Howard v. State*, 853 So. 2d 781, 796 (Miss. 2003)). And "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

¶37. If the defendant establishes deficiency, next, "the defendant must show that the deficient performance prejudiced the defense." *Id.* at 677. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different." *Ross*, 954 So. 2d at 1003-04 (citing *Davis v. State*, 897 So. 2d 960, 967 (Miss. 2004)). "A reasonable probability is a probability sufficient to undermine confidence

in the outcome." *Id.* at 1004 (citing *Davis*, 897 So. 2d at 967). "To assess the probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding—and reweigh it against the evidence in aggravation." *Chamberlin v. State*, 55 So. 3d 1046, 1054 (Miss. 2010) (first alteration in original) (internal quotation marks omitted) (quoting *Sears v. Upton*, 561 U.S. 945, 955-56, 130 S. Ct. 3259, 3266, 177 L. Ed. 2d 1025 (2010)). "[W]hen the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker," there is no prejudice. *Id.* (quoting *Sears*, 561 U.S. at 954).

¶38.    With this standard in mind, we deny Garcia's petition. From the face of Garcia's motion, attached exhibits,[4] and prior proceedings, we find it is plain that Garcia cannot establish he is entitled to any relief due to a deficient and prejudicial performance by trial counsel.

>    **I.    Were trial counsel ineffective for not pursuing and presenting FASD as a mitigator?**

¶39.    Garcia's primary contention is that his trial counsel was ineffective for not pursuing and presenting evidence of fetal alcohol syndrome disorder or fetal alcohol spectrum disorder

---

    [4] To support his ineffective-assistance claims, Garcia attached affidavits from (a) Dr. Storer; (b) individuals Dr. Storer interviewed; (c) Garcia's mother; (d) two of Garcia's sisters; and (e) several of Garcia's acquaintances. Garcia also offered four expert opinions from Drs. Natalie Novick Brown, Paul Connor, Matthew J. Holcomb, and Kenneth Lyons Jones.

15

(FASD) as a mitigating factor. Garcia contends FASD expert testimony would have explained that Garcia did not just experience a troubled childhood—rather, he suffers from a permanent neurobehavioral impairment inflicted by his mother's substance abuse while pregnant with Garcia. And he argues this neurophysical damage bore a direct correlation to his criminal actions and his demeanor at the sentencing hearing, including his apparent lack of remorse, which the trial judge held against him.

¶40. As this Court has acknowledged, in capital-murder cases like this, "[p]sychiatric and psychological evidence is crucial . . . ." *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 2009) (citing *Ake v. Oklahoma*, 470 U.S. 68, 80, 105 S. Ct. 1087, 1094, 84 L. Ed. 2d 53 (1985)). And "there is a critical interrelation between expert psychiatric assistance and minimally effective representation." *Id.* Here, Garcia's trial counsel obtained expert psychiatric assistance. Counsel retained Dr. Storer, an experienced forensic psychologist, who evaluated Garcia for mitigation purposes and testified at the sentencing hearing. As we have said, when "defense counsel has sought and acquired a psychological evaluation of the defendant for mitigation purposes, counsel generally will not be held ineffective for failure to request additional testing." *Ross*, 954 So. 2d at 1005 (citing *Moore v. Parker*, 425 F.3d 250, 254 (6th Cir. 2005); *Hall v. United States*, No. Civ.A. 4:00-CV-422-Y, CRIM. 4:94-CR-121-Y, 2004 WL 1908242, at *23 (N.D. Tex. Aug. 24, 2004)).

¶41. Still, Garcia insists his counsel had an additional duty—"the duty to ensure they had the right kind of expert." As support, Garcia cites *Evans v. State*, 109 So. 3d 1044, 1048

16

(Miss. 2013), claiming *Evans* suggests that counsel is ineffective if they do not consult with the proper specialist. But that is not what *Evans* says. Rather, *Evans* was about whether a trial court abused its discretion by denying an indigent murder defendant the funds to retain an additional expert specializing in PTSD to help explain his primary defense theory—imperfect self-defense. *Id.* *Evans* does not stand for the principle Garcia advocates—that to be effective, counsel must always seek consultation with not only a psychologist but also a specialist for a particular mental disorder.

¶42. According to Garcia's lead counsel, she had no reason to suspect a FASD diagnosis from Garcia's medical records or Dr. Storer's expert report. While Garcia likens his counsel's investigation to that in *Ross*, in that case, trial counsel failed to review the capital defendant's inmate records. *Ross*, 954 So. 2d at 1006. Nor did Ross's lawyers investigate *readily apparent* psychological problems and incorporate the defendant's psychological issues into the mitigation strategy. *Id.* Here, by contrast, trial counsel did obtain and review Garcia's records. And Garcia's counsel both retained the assistance of a psychological expert and incorporated Garcia's psychological issues and social history into their mitigation strategy.

¶43. We further find that Garcia's reliance on *Doss* is also misplaced. In *Doss*, counsel never "actually reviewed the records, which would have opened up several possible mitigation leads" and "failed to follow up with any of the potential witnesses . . . ." *Doss*, 19 So. 3d at 707. But here Garcia's counsel did. Not only did Garcia's counsel review

17

Garcia's medical records, they also investigated his background, interviewing multiple family members and friends—and none indicated Garcia had suffered from FASD.

¶44.    Even so, Garcia argues his counsel had ample indications of potential FASD from Dr. Storer's report and other witnesses who attested to Garcia's mother's drinking. In short, Garcia maintains trial counsel should have also retained a specific FASD expert to explore the *possibility* that Garcia may suffer from a neurodevelopmental disorder associated with prenatal alcohol exposure (ND-PAE). According to Garcia, there were "significant leads" in Garcia's medical records and social history that he may *possibly* suffer from FASD.

¶45.    As support, Garcia attaches the expert report of Dr. Natalie Novick Brown, whom Garcia retained post-sentencing. In Dr. Brown's opinion, "Garcia's prenatal alcohol exposure and functional and behavior history more than satisfy DSM-5 criteria" for Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure (ND-PAE)—a diagnosis that falls under the umbrella term FASD, which describes all medical conditions directly caused by alcohol exposure in utero. According to Dr. Brown, "[d]ata in [her] evaluation [of Garcia] reveal a lifelong pattern of cognitive and behavioral impairments in Mr. Garcia's functioning that together constitute 'textbook FASD.'" "Except for IQ," she stated, "the range and severity of Mr. Garcia's cognitive deficits and adaptive dysfunction are identical to intellectual disability."

¶46.    In his motion, Garcia emphasizes the above quote as "legally significant." Indeed, it pares down the issue to what Garcia is really trying to argue. Citing ***Atkins v. Virginia***, 536

18

U.S. 304, 320, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), Garcia claims that, because of his cognitive and behavioral impairments caused by prenatal alcohol exposure, he is morally less culpable. As he sees it, he is situated similarly to someone with an intellectual disability. In other words, what Garcia is really arguing is that—just as constitutionally competent counsel must investigate for signs that his or her client may be intellectually disabled and therefore ineligible for the death penalty—constitutionally competent counsel must also investigate for potential FASD.

¶47.    We find an obvious problem with this argument.

¶48.    And the primary problem is that no court has ever held that FASD is "no different functionally" than intellectual disability. Instead, "the prohibitions against executing the intellectually disabled have not been extended to individuals who may be mentally ill, including those who suffer from . . . FASD." *Tabler v. Lumpkin*, 543 F. Supp. 3d 461, 522 (W.D. Tex. 2021) (citing *Soliz v. Davis*, 750 F. App'x 282, 291 (5th Cir. 2018); *Shore v. Davis*, 845 F.3d 627, 634 (5th Cir. 2017); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014); *ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006)), *appeal filed*, No. 22-700001 (5th Cir. Feb. 25, 2022); *see also Garza v. Shinn*, No. CV-14-01901-PHX-SRB, 2021 WL 5850883, at *105 (D. Ariz. Dec. 9, 2021) ("There is no authority holding that individuals with FASD are exempt from capital punishment." (citing *In re Soliz*, 938 F.3d 200, 203 (5th Cir. 2019); *United States v. Fell*, No. 5:01-CR-12-01, 2016 WL 11550800, at *7 (D. Vt. Nov. 7, 2016))).

¶49. FASD may be a mitigating factor to be weighed against the aggravating factors in determining if a capital-murder convict should receive the death penalty. But it is not a death-penalty disqualifier. In fact, some courts have even questioned its value as a mitigating factor. While Garcia emphasizes FASD's mitigating effect, the Fifth Circuit has recognized that an FASD diagnosis is aggravating too because it suggests a likeliness of future dangerousness. *E.g.*, ***Brown v. Thaler***, 684 F.3d 482, 499 (5th Cir. 2012) ("The evidence that Brown claims his counsel should have presented[, which included FASD evidence,] is 'double-edged' because, although it 'might permit an inference that he is not as morally culpable for his behavior, it also might suggest [that he], as a product of his environment, is likely to continue to be dangerous in the future.'" (second alteration in original) (quoting ***Ladd v. Cockrell***, 311 F.3d 349, 360 (5th Cir. 2002))); *see also* ***Sells v. Stephens***, 536 F. App'x 483, 495 (5th Cir. 2013) ("[E]vidence of fetal alcohol syndrome-related deficiencies is not necessarily beneficial to a criminal defendant."); ***Gates v. Davis***, 660 F. App'x 270, 278 (5th Cir. 2016) ("[E]vidence of fetal alcohol syndrome-related deficiencies is mitigating in the sense that it might support an inference that Gates is not as morally culpable for his behavior, but it also is aggravating in the sense that it might support an inference that Gates is likely to continue to be dangerous in the future."). And future dangerousness is certainly a valid consideration. ***Bell v. State***, 725 So. 2d 836, 862 (Miss. 1998) ("In recognition of the fact that future dangerousness bears on all sentencing determinations, the United States

Supreme Court has approved consideration by juries of that factor." (citing ***Simmons v. South Carolina***, 512 U.S. 154, 162, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994))).

¶50.   In fact, the Fifth Circuit has held that no prejudice resulted from an alleged failure to present FASD-related testimony because it would have been a double-edged sword as far as mitigating evidence—it was just as likely to persuade jurors that the death-penalty was appropriate.  ***Trevino v. Davis (Trevino II)***, 861 F.3d 545, 551 (5th Cir. 2017).  And the Ninth Circuit has questioned whether a formal FASD diagnosis, in a case in which jurors had already heard significant evidence of the defendant's mental-health problems and his mother's alcohol abuse, would have changed any juror's mind in light of the aggravating circumstances.  ***Floyd v. Filson***, 949 F.3d 1128, 1140 (9th Cir. 2020).

¶51.   For the same reasons in ***Trevino II*** and ***Floyd*** that it was not prejudicial to fail to seek a formal FASD diagnosis as part of mitigation strategy, we find Garcia's counsel was not deficient in their mitigation investigation by not gleaning—from Garcia's medical and school records, family interviews, and expert evaluation—that Garcia may suffer from FASD.

¶52.   This is what distinguishes counsel's performance in this case from the allegedly deficient performance in ***Trevino v. Davis (Trevino I)***, 829 F.3d 328 (5th Cir. 2016).  In that case,

> [t]he record show[ed] that the minimal investigation conducted by Trevino's trial counsel here is remarkably similar to the investigation in ***Wiggins*** [***v. Smith***, 539 U.S. 510, 523, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003),] that the Supreme Court held to be constitutionally deficient. Not only did Trevino's trial counsel do *an abysmal job* of locating potential mitigation witnesses, but he failed to elicit *easily obtainable information* from the few interviews he

21

conducted, most notably the whereabouts of Trevino's mother. Trevino's trial counsel also admitted in a 2003 affidavit that the trial team "did not ask for any experts in this case other than to check the DNA results" and that "[i]n hindsight, we should have gotten mitigation expert [sic] to do a psycho-social history of Carlos' life . . . ."

*Id.* at 350 (fourth and fifth alterations in original) (emphasis added). By sharp contrast, Garcia's counsel located and interviewed multiple potential mitigation witnesses, including Garcia's mother. Here, no "easily obtainable information" was left undiscovered. *Id.*

¶53. We thus find no deficiency in counsel's performance for not pursuing a *possible* FASD diagnosis and expert testimony

¶54. We further find double-edged FASD evidence would not have tilted the aggravating-mitigating balance drastically. The trial judge was presented with fourteen mitigators—including Garcia's abusive, chaotic childhood; his mother's mental-health and substance-use problems; his exposure to domestic violence; and his own mental-health problems. After a three-day hearing, she found three mitigators: his "lack of significant criminal history, relatively young age, and difficult childhood." *Garcia I*, 300 So. 3d at 952. Adding FASD evidence may have helped explain his criminal behavior. But alongside FASD's double-edged nature, the Supreme Court has deemed such mitigating evidence weak. *See Schriro v. Landrigan*, 550 U.S. 465, 480-81, 127 S. Ct. 1933, 1944, 167 L. Ed. 2d 836 (2007) (characterizing Landrigan's mitigation evidence—which included evidence of exposure to alcohol and drugs in utero that "may have resulted in cognitive and behavioral deficiencies consistent with fetal alcohol syndrome"—as "weak"); *see also Cummings v.*

22

*Martel*, 796 F.3d 1135, 1149 (9th Cir. 2015) (stating that *Schriro* "describ[ed] defendant's assertion that he was 'exposed to alcohol and drugs *in utero*, which may have resulted in cognitive and behavioral deficiencies' as 'weak' mitigation evidence" (quoting *Schriro*, 550 U.S. at 480-81)); *Lee v. Ryan*, No. CV-01-2178-PHX-GMS, 2019 WL 2617052, at *11 (D. Ariz. June 26, 2019) (same (citing *Schriro*, 550 U.S. at 481)).

¶55. Weighed against these mitigators were two strong aggravators: "[T]he young victim was killed during the course of a sexual battery[,] and the nature of the capital offense was especially heinous, atrocious, and cruel[.]" *Garcia I*, 300 So. 3d at 952. And the latter was so egregious that the trial judge—a former assistant district attorney who has served on the bench for more than fifteen years—called Garcia's case "one [of] the worst" cases in her career. We find, in taking all the evidence together, no reasonable probability exists that FASD evidence would have caused the veteran trial judge to strike a different balance.

## II. Were trial counsel ineffective for not presenting and explaining all available mitigating evidence?

¶56. Next, we address Garcia's claim that his trial counsel were ineffective for not presenting and explaining all available mitigating evidence.

¶57. "Under *Strickland*, counsel has a duty 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Ross*, 954 So. 2d at 1005 (quoting *Strickland*, 466 U.S. at 691). As part of the duty to make reasonable investigations, "counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case." *Id.* at 1005 (quoting *Ferguson v.*

23

*State*, 507 So. 2d 94, 96 (Miss. 1987)). "[C]ounsel is not required to exhaust every conceivable avenue of investigation . . . ." *Id.* (citing *Tokman*, 564 So. 2d at 1343). But in the capital context "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)).

¶58. Garcia asserts his trial counsel did not even present a fraction of all the available mitigating evidence. His complaint is two-fold.

¶59. First, Garcia argues that his counsel did not reach out to family, friends, and acquaintances. As support, Garcia attached to his motion affidavits by family members, including his mother, detailing generations of abuse—first by his grandmother on his mother and then by his mother on Garcia and his siblings. These affidavits also delved into Garcia's mother's drug and alcohol abuse. And they described its impact on her children, as well as pervasive mental illness suffered by Garcia's mother and many of her children, including Garcia's brother, who was hospitalized as a child with Garcia. Affidavits by family and Garcia's friends described Garcia's "simple and childlike" manner and how he was a follower not a leader. In his motion, Garcia insists that "[f]amily alone would have provided evidence of a wealth of mitigating evidence—a lifetime of trauma including multi-generational abuse and neglect, multi-generational mental illness, sexual abuse,

24

including incest, poverty, the list goes on and on." But no family members testified at the sentencing hearing. Nor did any friends, except Hobby, whose testimony was limited.

¶60. Second, Garcia claims his trial counsel were deficient for relying on Dr. Storer, who Garcia claims was an inadequate expert. According to Garcia, Dr. Storer "offered little-to-nothing in the way of expert explanation that could support a reasoned moral decision in favor of life over death." Garcia argues that, aside from how Garcia's adverse childhood experiences manifested sexually, Dr. Storer made no substantive connection between the mitigators and Garcia's adulthood. For example, Garcia contends Dr. Storer's testimony that Garcia's anxiety disorder had no bearing on his crimes led the trial judge to dismiss the anxiety disorder's mitigating effect. Similarly, Garcia asserts that Dr. Storer's testimony about Garcia's adverse childhood and its impact on him as an adult was superficial and unhelpful to the sentencer. And even with Garcia's sexual history, Garcia claims Dr. Storer lacked expertise, admitting to being surprised by research showing how adverse childhood experiences manifest sexually. In Garcia's view, an adequate psychological expert would not have to admit this. Further, the sexually deviant history Dr. Storer detailed was not exactly mitigating for Garcia.

¶61. After review, we find that Garcia has not made a substantial showing that trial counsel were ineffective for not presenting and explaining all mitigating evidence.

¶62. "[C]ounsel will not be deemed ineffective if there is proof of investigation or if there is no factual basis for the [petitioner's] claim." *Ross*, 954 So. 2d at 1006. And here, the

25

record shows that trial counsel interviewed potential witnesses and performed a thorough investigation. At sentencing, one of Garcia's attorneys told the trial judge that trial counsel and their mitigation experts had interviewed approximately sixteen people. In fact, trial counsel had "looked into everybody who knew Mr. Garcia . . . that we're . . . allowed to talk to." In her post-conviction affidavit, she maintains that trial counsel's two Florida-based mitigation investigators "contacted most—if not all—of Mr. Garcia's family members and friends." Likewise, Dr. Storer—whose purpose included assisting trial counsel "in determining . . . [a]ny mitigating circumstances"—interviewed siblings, a friend, and a former foster parent. Dr. Storer also unsuccessfully tried to contact others, including Garcia's roommate at the time of the crimes, who declined to speak with him. Still more, trial counsel obtained Garcia's childhood hospital records. Dr. Storer tried to obtain other medical and foster-care records but was told they did not exist.

¶63. Moreover, trial counsel were not deficient in presenting mitigating evidence. Though Garcia complains that no family member testified about his "lifetime of trauma," most of them wanted no involvement. According to one of Garcia's attorneys at sentencing, "We've tried to get [family and friends] to come, and like I said, due to the notoriety, the facts of the case, a lot of folks just don't want to be involved." In her post-conviction affidavit, this same attorney reiterated that, "[f]or the most part," Garcia's "family and friends indicated no proactive desire to participate in his sentencing trial." Trial counsel had asked Garcia's

26

mother and a sister to testify, but neither did. For others Garcia now claims should have been called, trial counsel had reasons for not calling them to testify.

¶64. For example, one of Garcia's brothers wanted no contact with his family. And one of Garcia's suggested friends neither knew Garcia well nor had anything good to say about him. Finally, as to the friends who traveled to Mississippi for the trial, Garcia *asked* trial counsel *not* to call them. "In the end," Garcia's trial counsel explained, "Mr. Garcia did not want his family and friends to travel to Mississippi to see him receive a death sentence." And trial counsel were not ineffective for complying with Garcia's informed decision. *Brawner v. State*, 947 So. 2d 254, 264 (Miss. 2006) ("Our own law does not require trial counsel to go against the fully informed and voluntary wishes of his client to refrain from presenting mitigating evidence." (citing *Burns v. State*, 879 So. 2d 1000, 1006 (Miss. 2004))). As we have previously held, "[a] defendant may not block his lawyer's efforts and later claim the resulting performance was constitutionally deficient." *Id.* (citing *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000)).

¶65. Yet, despite the constraints, trial counsel presented Garcia's difficult childhood and dysfunctional family through Dr. Storer, an experienced clinical and forensic psychologist who has testified as an expert between thirty and fifty times. He was retained, in part, to "assist in determining . . . [a]ny mitigating circumstances." As part of his evaluation, he reviewed numerous documents and interviewed collateral sources. His four interviews with Garcia spanned a total of fourteen to fifteen hours. And in his sentencing-hearing testimony,

27

Dr. Storer discussed Garcia's mother's alcohol and drug use, mental-health issues, lengthy disappearances, and abusive relationship with her boyfriend. Dr. Storer also described Garcia's physical and sexual abuse; his homelessness, including being kicked out of the house at age thirteen; and his early alcohol use, behavioral and mental-health struggles, and academic problems.

¶66. "Claims that additional witnesses should have been called are disfavored." *Hutto v. State*, 286 So. 3d 653, 661 (Miss. 2019) (internal quotation marks omitted) (quoting *Turner v. State*, 953 So. 2d 1063, 1074 (Miss. 2007)). To succeed on such claims, the petitioner must show that "had the affiants been called to testify, there [i]s a reasonable probability that the result of the proceeding would have been different." *Id.* (internal quotation marks omitted) (quoting *Moffett v. State*, 156 So. 3d 835, 849 (Miss. 2014)). But if the new mitigating evidence "'would barely have altered the sentencing profile presented' to the decisionmaker," then no prejudice exists. *Id.* (internal quotation marks omitted) (quoting *Chamberlin*, 55 So. 3d at 1054). Here, the testimonies that Garcia now offers from his mother, siblings, and friends would have provided more details and anecdotes. But they are mostly cumulative and would have *barely* altered Garcia's sentencing profile. *See Hutto*, 286 So. 3d at 661.

¶67. Turning to Garcia's second claim—that counsel was deficient for presenting Dr. Storer's "inadequate" expert testimony—we find Dr. Storer's testimony was adequate. Contrary to Garcia's assertions, Dr. Storer's mitigation presentation amounted to more than

28

just the gist of an article he had read. He discussed and provided fourteen mitigating factors. And in at least one way, he connected those factors—which largely centered on Garcia's adverse childhood—to Garcia's difficulties in adulthood. When asked "is there any connection between [Garcia's] adverse childhood experiences and how they manifest themselves in adulthood," Dr. Storer explained that one article said that "quite a bit of evidence" shows that "adverse childhood experiences correlate to people having difficulty." One of those difficulties, he continued, is a correlation with sexual deviance. He then discussed Garcia's sexual history, which began early and possibly developed into (among other things) a "sadistic sexual paraphilic disorder"—"[s]adism" meaning "the controlling, the domination, the infliction of pain on someone else for sexual satisfaction." Such behavior, of course, is relevant to the crimes here.

¶68. While Garcia cites ***Penry v. Lynaugh***, for his claim that Dr. Storer's failure to explain how Garcia's adverse childhood affected Garcia psychologically left the trial judge unable to "give effect" to the evidence, we find ***Penry*** to be inapposite. ***Penry v. Lynaugh***, 492 U.S. 302, 319, 109 S. Ct. 2934, 2947, 106 L. Ed. 2d 256 (1989), *abrogated on other grounds by* ***Atkins***, 536 U.S. 304. In ***Penry***, the United States Supreme Court did say that "[t]he sentencer must . . . be able to consider and give effect to [mitigating] evidence in imposing sentence." ***Id.*** (citing ***Hitchcock v. Dugger***, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987)). But the issue in ***Penry*** was that the jury received *no instruction* that it could

29

consider Penry's evidence as mitigating or give mitigating effect to his evidence. *Id.* The issue was not, as it is here, the alleged inadequacy of the presentation of mitigation evidence.

¶69.   We also distinguish this case from *Ross*.   There, defense counsel's mitigating evidence consisted of testimony from Ross, family, a jailhouse minister, and a sheriff. *Ross*, 954 So. 2d at 1005.   Later psychological testing showed several potential mitigators, including "physical and sexual abuse, possible alcoholism, accounts of visual and auditory hallucinations, . . . the deaths of [Ross's] ex-wife and four young children in a car accident . . . and the brutal murder of his sister[,] . . . and Ross['s] . . . taking anti-psychotic medication and medication for depression." *Id.* at 1006.   "[U]ndoubtedly," we said, Ross had "demonstrate[d] a need to develop mitigating evidence based on potential psychological problems." *Id.*   Though there had been some testimony about the deaths of family members, physical abuse, and drinking problems, "defense counsel provided no expert evidence about how th[o]se events had affected Ross psychologically." *Id.*

¶70.   Here, in contrast, Garcia had the benefit of an expert—Dr. Storer.   And the record betrays any suggestion that Dr. Storer's testimony was so deficient that Garcia effectively had no expert.   Further, to the extent Garcia argues that Dr. Storer's testimony was ineffective, he is not entitled to effective assistance of an expert. *Brown v. State*, 798 So. 2d 481, 499 (Miss. 2001) (citing *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998)).

¶71.   Bottom line, we find more (or better) lay or expert witnesses cannot surmount the extreme and  substantial aggravators in this case.  As the trial judge noted at sentencing, she

had seen many capital murder cases and read many others. And in comparing Garcia's case to those others, Garcia's was "one the worst in terms of what happened to this child and her ensuing death." So even if we took the mitigation evidence presented at sentencing *and* the additional evidence Garcia now presents in his present motion and "reweigh[ed] it against the evidence in aggravation," we fail to discern any probability of a different outcome under *Strickland*. *Chamberlin*, 55 So. 3d at 1054 (quoting *Sears*, 561 U.S. at 956).

### III. Were trial counsel ineffective for not developing and presenting evidence about Gray's substantial domination of Garcia during the crime as a mitigator?

¶72. Finally, we address the claim in Garcia's motion that trial counsel were ineffective for failing to explore "the depth of depravity and domination that Julian Casper Gray held over Mr. Garcia." One statutory mitigator is that "[t]he defendant acted . . . under the substantial domination of another person." Miss. Code. Ann. § 99-19-101(6)(e) (Rev. 2020). Garcia claims that he acted under Gray's substantial domination and control when he committed his horrific crime. And a "proper mitigation presentation," Garcia suggests, would have explored his and Gray's relationship—namely, the combination of Garcia's vulnerable state (i.e., his simple and childlike manner, his history of mental illness, and FASD) and Gray's history of domination and abuse. But we find no deficiency in trial counsel's investigation and presentation of Garcia and Gray's relationship.

¶73. While Garcia criticizes his trial counsel for calling only Hobby to testify about this, he fails to identify any witnesses who were available to testify and would have provided

31

additional, noncumulative evidence. Trial counsel did interview another woman who was also involved with Gray during the time of his friendship with Garcia. But counsel strategically chose not to call her. Counsel's reason for not calling her as a witness was because she "had nothing positive to say about [Garcia]." She described him as "creepy." And she had only irrelevant information about Gray. Such a decision "falls within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Bell v. State*, 879 So. 2d 423, 434 (Miss. 2004) (citing *Jackson v. State*, 815 So. 2d 1196, 1200 (Miss. 2002)). A third woman romantically involved with Gray during his friendship with Garcia could not be located by trial counsel despite best efforts. Apparently, when news of JT's disappearance broke, this woman left town.

¶74. Still, Garcia's post-conviction evidence by these two women and Hobby is cumulative. At the sentencing hearing, Hobby testified that Gray dominated his and Garcia's odd, unhealthy relationship. She said that Gray "mistreated" and "took advantage" of Garcia—if Gray told Garcia to do something, Garcia did it. And she said that Gray's sexual perversion prompted her to contact police. Because of Gray's "past of child pornography," his "attraction to children," and Hobby's own personal history with him, she thought he should be investigated. Moreover, the trial judge had already heard that Gray was under indictment for possession of child pornography.

¶75. Garcia points to other witnesses—namely, family and friends—that have provided post-conviction testimony of how Garcia is easily dominated by others. According to Garcia,

it was his lifetime of trauma combined with Gray's domineering traits that culminated in Garcia's *being led* into the dire, depraved situation the day JT was raped and murdered. So evidence of Gray's substantial domination, Garcia asserts, would have caused a different result. But this pitch runs into the same problem as his broader claim that his trial counsel failed to present all mitigation evidence—namely, that Garcia's family and friends wanted zero part of his sentencing hearing because of the atrocity of his crime. And the friends who did appear were waved off by Garcia himself. So, again, Garcia fails to identify any witnesses who were *available* to testify in support of this claim.

¶76. Even so, any additional evidence of Gray's dominating nature and Garcia's easily manipulated nature would have hardly altered his sentencing profile. While Garcia cites two cases to support his claim—***Ben-Sholom v. Ayers***, 566 F. Supp. 2d 1053 (E.D. Cal. 2008), and ***Cooper v. Secretary, Department of Corrections***, 646 F.3d 1328 (11th Cir. 2011)—both are distinguishable. In those cases, codefendants were involved. ***Ben-Sholom***, 566 F. Supp. 2d at 1057; ***Cooper***, 646 F.3d at 1331. Here, by contrast, no physical evidence tied Gray to the crimes. Nor was he ever charged. And his involvement, if proved, would do little to move the needle. The trial judge, having heard about the nature of Gray and Garcia's relationship, specifically found that Gray's involvement would not lessen Garcia's culpability. As she stated, "regardless of whether Mr. Gray was involved, Mr. Garcia's responsible for his own actions. He is responsible for that sexual battery, and he is responsible for that death." *See **Jordan v. State***, 918 So. 2d 636, 658-59 (Miss. 2005)

33

(holding that defendant who confessed to being a major actor in a double capital murder could be sentenced to death, even though his codefendant received a lesser sentence).

## IV. Conclusion

¶77. After reviewing the claims in Garcia's motion under heightened scrutiny, we conclude Garcia does not present a substantial showing that he was denied the right to effective assistance of counsel. We thus deny the motion and his oral-argument request.

¶78. **POST-CONVICTION RELIEF DENIED.**

**RANDOLPH, C.J., COLEMAN, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND ISHEE, J.; COLEMAN, J., JOINS IN PART.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶79. I concur with the majority's conclusion that Garcia has failed to demonstrate that he received ineffective assistance of counsel at sentencing. I write separately to expound briefly on the analysis of fetal alcohol syndrome disorder (FASD) as a "double-edged" mitigating factor in death penalty sentencing. Maj. Op. ¶ 2 (internal quotation marks omitted) (quoting *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012)).

¶80. FASD is a mitigating circumstance, and failure to investigate FASD has been found to be a ground for a finding of ineffective assistance of counsel following a death sentence. *Trevino v. Davis*, 829 F.3d 328 (5th Cir. 2016). "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors,

34

the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." ***Strickland v. Washington***, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

¶81.    Mitigating evidence can be double-edged; that is, once introduced and considered, the evidence may also be aggravating. ***Brown***, 684 F.3d at 499; ***Trevino***, 829 F.3d at 338. Trial counsel, therefore, often is within sound trial strategy to elect not to present double-edged evidence at sentencing. *Id.* Character evidence is a prime example of typical double-edged evidence that may be as damning to the accused as it is helpful. In ***Trevino***, the United States Court of Appeals for the Fifth Circuit rejected an ineffective assistance of counsel claim related to mitigating character evidence when the testimony also would have included aggravating character evidence "that Trevino was 'always high' from sniffing spray paint, that he was abusive to the mother of one of his children and had two sides to his personality, that he was 'always jealous,' 'angry,' 'violent,' and 'impulsive' even when he was not drunk, and that he always had a gun." *Id.* at 338 (quoting ***Trevino v. Stephens***, No. SA-01-CA-306-XR, 2015 WL 3651534, at *9 (W.D. Tex. June 11, 2015)). In that example, not presenting the evidence withdraws both the mitigating and aggravating edges of the double-edged sword.

¶82.    Lack of remorse is an aggravating factor in death penalty sentencing; however, evidence that a defendant's lack of remorse is associated with neurological damage from a

35

condition such as FASD has high mitigating value, distinguishing it from the typical double-edged evidence scenario. *Trevino*, 829 F.3d at 351. The Fifth Circuit made the distinction in *Trevino*:

> It is worthwhile to distinguish between Trevino's proposed character witness testimony and his proposed FASD evidence. The character witness testimony certainly falls under the classic "double-edged" evidence distinction discussed above . . . but the FASD evidence potentially has far greater mitigation value.

*Id.* In *Trevino*, the district court had denied Trevino's ineffective assistance of counsel claim, holding that the new mitigating evidence (including FASD) "could not outweigh the substantial aggravating evidence presented at trial." *Id.* at 336. The Fifth Circuit reversed, noting that to the district court "Trevino's apparent lack of remorse seemed to be the primary piece of aggravating evidence." *Id.*

¶83. Here, the sentencing judge singled out and commented on Garcia's lack of remorse as a strong aggravating factor when imposing the death sentence. With that edge of the sword already present, any properly founded FASD evidence would have served only to mitigate that aggravating factor. I would avoid being overly dismissive of the potential for FASD to be a high-value mitigating factor, particularly in relation to the aggravating factor of apparent lack of remorse. *See* Maj. Op. ¶ 2.[5]

---

[5] "FASD evidence can indeed be "double-edged"—just as likely to be aggravating as mitigating. For this reason, there is no reasonable probability that FASD evidence would have caused the sentencing judge to find that the mitigators outweighed the aggravators . . . ." Maj. Op. ¶ 2.

¶84. But I agree with the majority's ultimate holding that Garcia has not satisfied the two-pronged *Strickland* standard for ineffective assistance of counsel at sentencing.[6] Therefore, I concur in part and in result.

**KING, P.J., AND ISHEE, J., JOIN THIS OPINION. COLEMAN, J., JOINS THIS OPINION IN PART.**

---

[6] Garcia's circumstances are distinguishable from the circumstances considered by the court in *Trevino*, in which the entirety of the mitigating evidence presented at sentencing consisted of the brief testimony of one family member. *Trevino*, 829 F.3d at 333. Subsequent investigation revealed extensive evidence of the effect of FASD on Trevino's life since his early childhood. *Id.*